IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LEXOS MEDIA IP, LLC,

      Plaintiff,

      v.

OVERSTOCK.COM, INC.,

      Defendant.

Case No. 22-2324-JAR

## MEMORANDUM AND ORDER

Plaintiff Lexos Media IP, LLC ("Lexos") brings this patent infringement action against Defendant Overstock.com, Inc. ("Overstock"), alleging it infringed three patents that relate to modifying the display of a cursor image on a website. This matter is before the Court on Lexos's Opposition to Defendant's Motion to Exclude the Testimony of Samule [sic] Russ, Ph.D. (Doc. 194), and Response to Defendant's Motion for Summary Judgment (Doc. 193). The Court previously directed each attorney for Lexos listed on the signature blocks of Docs. 193 and 194 to show cause in writing why they should not be sanctioned under Fed. R. Civ. P. 11 and referred to the relevant disciplinary administrators for signing and submitting documents in this case that contain defective legal citations created through the use of generative artificial intelligence ("AI"), which were not checked and confirmed before filing.

Lexos's attorneys responded to the Court's Order to Show Cause with declarations, and the Court is prepared to rule on whether they should be sanctioned under Rule 11. As described more fully below, the Court finds that all five Lexos attorneys violated Rule 11(b) by signing filings that included fabricated and misrepresented legal authority. The Court releases counsel Michael Doell from further sanctions. The Court sanctions the remaining attorneys proportionate to their role in the violations.

## I.    Background

### A.    Attorneys of Record for Lexos and the July 7, 2025 Filings

Six attorneys are listed as counsel of record for Lexos.  Kenneth P. Kula, Michael W. Doell, Christopher M. Joe, and Eric W. Buether from the Texas law firm Buether Joe & Counselors, LLC are all admitted pro hac vice.  Sandeep Seth of SethLaw PLLC in Texas is also admitted pro hac vice.  David R. Cooper of the Kansas firm Fisher, Patterson, Sayler & Smith, LLP, is local counsel.  Buether Joe & Counselors, LLC is handling this case on behalf of Lexos on a contingent-fee basis.  Mr. Buether and Mr. Kula appeared on behalf of Lexos at the in-person claim construction hearing on September 21, 2023.[1]  According to Mr. Joe's declaration, "[i]n October 2024, the lead attorney in charge in this case[,] Eric Buether (and my law partner)[,] passed away.  I took his place as the lead attorney in charge of this case after his passing."[2]  Mr. Seth was permitted to appear as co-counsel in this matter pro hac vice on March 28, 2023.[3]  He has a small practice comprised of himself and a paralegal who also works as an office manager.  "[His] practice largely involves co-counseling with other firms."[4]

Overstock filed a motion for summary judgment and two motions to exclude expert testimony under *Daubert* on June 13, 2025.[5]  Relevant to the issues before the Court is Overstock's motion to exclude Samuel Russ, Ph.D., who Lexos designated as its technical expert

---

[1] Doc. 98.

[2] Doc. 217-5 ¶ 4.  The Court notes that no withdrawal of appearance has been filed for Mr. Buether; he still appears as an active attorney on the docket more than one year after his death.

[3] Doc. 51.  The Court is aware that Lexos has filed many other lawsuits around the country to enforce the same patents at issue in this case.  A short review of those cases on Westlaw indicates that the Buether law firm and Mr. Seth together represent Lexos in several of those cases too.  *See, e.g.*, *Lexos Media IP, LLC v. eBay Inc.*, 722 F. Supp. 3d 1042 (N.D. Cal. 2024); *Lexos Media IP, LLC v. Amazon.com, Inc.*, No. 2:22-CV-00169-JRG, 2023 WL 5723642 (E.D. Tex. Sept. 5, 2023); *Lexos Media IP LLC v. MSC Indus. Direct Co.*, No. 3:22-CV-1736-X, 2023 WL 11967299 (N.D. Tex. Sept. 6, 2023).

[4] Doc. 217-1 ¶ 13.

[5] Docs. 174, 175, 177.

in this case.  In his opening report, Dr. Russ incorrectly identified the stipulated claim

construction for "cursor image" as "a movable image on a display screen whose position can be

controlled through a user interface."[6]  In other words, he failed to include the second part of the

claim construction: ". . . and that indicates where user input can be received."[7]  Overstock's

motion to exclude Dr. Russ's testimony argues that because he considered the incorrect claim

construction for "cursor image," his opinion should be excluded.[8]  And as part of its motion for

summary judgment, Overstock argues that without Dr. Russ's technical opinion, Lexos cannot

show as a matter of law that Overstock infringed.[9]

Lexos responded to Overstock's motions on time.[10]  Counsel neither sought, nor

apparently discussed, seeking an extension of time.  In their declarations submitted in response to

the Court's Order to Show Cause, counsel broke down their division of labor on the responses to

Overstock's June 13 motions.  Mr. Kula worked on the response to Overstock's other motion to

exclude, pertaining to Lexos's damages expert, Justin Blok.  Mr. Seth "was assigned the ultimate

responsibility to draft, review, finalize, and ensure proper filing of both" the summary-judgment

response and the response to Overstock's motion to exclude Dr. Russ.[11]  Mr. Doell worked on

"the initial drafting of some sections"[12] of the response to Overstock's summary-judgment

motion, but Mr. Seth "was primarily responsible for drafting"[13] the response to Overstock's

---

[6] Doc. 174-2 at 4.

[7] *See* Doc. 92-1 at 8, Doc. 99 at 6.

[8] Doc. 174 at 8–14.

[9] Doc. 177 at 31–35.

[10] Docs. 190, 193, 194 (superseding Doc. 192).

[11] Doc. 217-5 ¶ 8.

[12] Doc. 217-3 ¶ 5.

[13] Doc. 217-1 ¶ 5.

motion to exclude Dr. Russ's report and testimony and the response to the summary-judgment motion. Mr. Joe, "never reviewed or looked at the documents at issue prior to their filing with the Court."[14]

Mr. Cooper did not research or draft any of these filings. He received the Texas attorneys' drafts on July 7, 2025, the same day they were due. He read them in their entirety and generally understood the arguments being made therein. "[N]one of the quotes or citations drew [his] attention, so [he] did not cite check either document. [He] instead relied upon Mr. Doell and Mr. Seth, whom [he] understood to be the drafters of the documents, for the accuracy and authenticity of the citations in the documents."[15]

## B.    Incorrect Citations, Quotations, and Statements of Law

The response briefs to Overstock's motion to exclude Dr. Russ and motion for summary judgment contain multiple problematic legal citations and statements of authority that were created through the use of generative AI, which were not checked and confirmed before filing. First, and primarily, Plaintiff's response to the motion to exclude Dr. Russ (Doc. 194) contains a litany of problems: (1) nonexistent quotations; (2) nonexistent and incorrect citations; and (3) misrepresentations about cited authority. Overstock submitted a reply brief disclosing the defective citations, quotations, and statements of authority,[16] and Mr. Seth admits that he used generative AI to help research and draft the brief without confirming the accuracy of authority it produced.[17] Second, Part III.D of Plaintiff's Response to Defendant's Motion for Summary

---

[14] Doc. 217-5 ¶ 7.

[15] Doc. 217-2 ¶ 13.

[16] Doc. 200-1 (providing a table of fabricated and misleading case citations in Plaintiff's response brief to the motion to exclude Dr. Russ).

[17] Doc. 217-1 ¶¶ 5–9; Doc. 207 at 3 n.1 (admitting that Plaintiff's response to the summary judgment motion also contains "two paragraphs with the same mistake which were carried over concerning the *Cordis*, *Baldwin*, and *AstraZeneca* cases" and requesting that "the Court strike these citations" (citations omitted)).

Judgment (Doc. 193) addresses Overstock's argument that Dr. Russ's failure to incorporate the correct claim construction for "cursor image" precludes its infringement theory. As part of that argument, Lexos included several of the same defects from the response to Overstock's motion to exclude Dr. Russ.

The *Daubert* response, Doc. 194, contains the following erroneous citations, quotations, or statements of authority:

1.      Lexos cited *Flexuspine, Inc. v. Globus Medical, Inc.*, **879 F.3d 1369, 1375 (Fed. Cir. 2018)** and *i4i Ltd. P'ship v. Microsoft Corp.*, **598 F.3d 831, 856–57 (Fed. Cir. 2010),** *aff'd*, **564 U.S. 91 (2011)**, for the proposition that "the Federal Circuit has cautioned against striking expert opinions for immaterial or correctable errors in claim construction, particularly where the overall analysis is sound and does not mislead the jury."[18]

*Flexuspine* contains no discussion of expert admissibility on the cited page number. On a later page, the Federal Circuit considered a challenge to the district court's ruling of noninfringement on the basis that there was no evidence to support the second portion of the plaintiff's claim construction because the expert did not discuss it.[19] But the court found no error with the district court's order and noted that the plaintiff "does not cite to any evidence that might satisfy the second requirement of the claim construction."[20] This case does not support the proposition for which it was cited.

In *Microsoft*, the Federal Circuit considered the district court's decision to admit expert testimony on the appropriate damages calculation and to support the degree of infringement through survey evidence. The court concluded that the damages expert's royalty calculations

---

[18] Doc. 194 at 6.

[19] 879 F.3d at 1377.

[20] *Id.*

were based on a sound methodology, and that the defendant's objections went to the weight, rather than the admissibility of the evidence.[21]   The court also considered a challenge to survey evidence that was offered to support the degree of infringement.[22]   The defendant challenged the survey's methodology and the data used to extrapolate damage calculations from the survey, but the court determined that the survey met the minimum standards required for relevance and reliability.[23]   And the court found that the challenges were best addressed through cross-examination and the presentation of contrary evidence.[24]   Neither challenge to the expert evidence in this case related to an incomplete claim construction.   This case does not support the proposition for which it was cited.

2.    Lexos cited *United States v. Rodriguez-Felix*, **450 F.3d 1117, 1123 (10th Cir. 2006)** for the proposition that Tenth Circuit case law recognizes a preference for "addressing admissibility disputes that go to weight rather than fundamental reliability [with] '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof,' not wholesale exclusion."[25]   This language is not in *Rodriguez-Felix*; it is in *Daubert*.[26]

Moreover, *Rodriguez-Felix*, a criminal case, addressed the specific issue of expert testimony on the reliability of eyewitness identification.[27]   The Tenth Circuit determined that the district court did not abuse its discretion in excluding a defendant's expert testimony about the reliability of eyewitness testimony, largely because such testimony was unlikely to assist the

---

[21] *Microsoft*, 598 F.3d at 854.

[22] *Id.* at 855–56.

[23] *Id.* at 856.

[24] *Id.*

[25] Doc. 194 at 6.

[26] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

[27] *Rodriguez-Felix*, 450 F.3d at 1123–27.

jury.[28]  Instead, the court explained that "skillful cross-examination provides an equally, if not

more, effective tool *for testing the reliability of an eyewitness at trial*."[29]  Although the statement

of law by Lexos is not incorrect,[30] this particular case neither includes the quotation attributed to

it nor discusses the court's preference for testing *expert testimony* that goes to the weight of the

evidence through cross-examination, contrary evidence, and jury instructions.

> 3.      Lexos twice cited *Hockett v. City of Topeka*, No. 19-4037-DDC, 2020 WL
6796766, at \*3 (D. Kan. Nov. 19, 2020).  It cited this case first for the proposition that
"[e]xclusion is a 'drastic remedy' and is only warranted where the report is irreparably unreliable
or prejudicially misleading."[31]  Second, it cited *Hockett* to argue that inadvertent use of an
incomplete claim construction by an expert does not require exclusion, but instead cross-
examination and supplementation.[32]  The second citation includes an explanatory parenthetical
with a quotation from the case: "The exclusion of evidence is an extreme sanction, and courts
should prefer less severe remedies, particularly where the error appears inadvertent or can be
cured without prejudice."[33]  Neither this case nor the quotation exists.[34]

> 4.      Lexos cited *AVM Techs., LLC v. Intel Corp.*, 927 F.3d 1364, 1370–71 (Fed. Cir.
2019) for the proposition that "deficiencies in a report that go to weight, not admissibility, should

---

[28] *Id.* at 1125.

[29] *Id.* (emphasis added).

[30] *See Daubert*, 509 U.S. at 596.

[31] Doc. 194 at 6.

[32] *Id.* at 13.

[33] *Id.*

[34] This case number is a Social Security appeal, *Russell v. Comm'r of Soc. Sec. Admin*.  The undersigned, not District Judge Daniel D. Crabtree, presided over that case.  There is no case against the City of Topeka in the Court's CM/ECF database by a plaintiff with the last name of Hockett.  Nor can the Court locate this case in the Westlaw database in any other federal jurisdiction.

be resolved by cross-examination."[35]  This citation is incorrect.  The correct citation is *AVM Techs., LLC v. Intel Corp.*, 927 F. Supp. 2d 139 (D. Del. 2013).  This case involved motions to exclude two expert witnesses in a patent case: (1) an expert witness on royalty damages who relied on a single settlement agreement on a different patent; and (2) the patent inventor's testimony about damages.  The court determined that neither expert offered reliable testimony under *Daubert* and granted motions to exclude them both.[36]  This case does not support the proposition for which it was cited, even if the citation was correct.

5.    Lexos quoted from and relied on ***Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 (Fed. Cir. 2006)**.[37]  There are multiple problems with this authority.  First, Lexos provided the following quotation from this case in an explanatory parenthetical: "Expert testimony should not be excluded simply because the expert applied an incorrect claim construction, so long as the expert's analysis can be understood and evaluated in light of the court's proper construction."[38]  This quotation does not exist.

Second, Lexos cited this case for the proposition that "[t]he Federal Circuit has consistently held that expert opinions based on even partially incorrect constructions may be admissible where the expert's methodology remains sound."[39]  But *Liquid Dynamics* does not support this proposition.  To be sure, the court determined in that case that the defendant's challenge to certain parameters used by the expert in his analysis went to the weight and not the admissibility of the opinion.[40]  But that ruling was not based on an incorrect claim construction

---

[35] Doc. 194 at 6.

[36] *Intel Corp.*, 927 F. Supp. 2d at 141.

[37] Doc. 194 at 7.

[38] *Id.*

[39] *Id.*

[40] *Liquid Dynamics*, 449 F.3d at 1220–21.

used by the expert.   The Federal Circuit separately ruled as follows on the issue of the expert's reliance on an incorrect claim construction:

> The district court excluded the expert opinion evidence [on enablement] as irrelevant because it was based on an impermissible claim construction and relied heavily on Figure 6 of the patent specification that shows perfect helical flow instead of substantial helical flow.  Furthermore, the court found that the evidence could prejudice and confuse the jury. Since the enablement inquiry necessarily depends on an interpretation of the claims, we conclude that the district court did not abuse its discretion in excluding the expert's testimony pertaining to enablement.[41]

6.    Lexos cited two cases for the proposition that "[t]he Federal Circuit has consistently held that 'technical flaws in an expert's methodology or assumptions go to the weight of the evidence rather than its admissibility.'"[42]  Immediately following this quotation, Lexos cited ***Apple Inc. v. Motorola*, Inc., 757 F.3d 1286, 1314 (Fed. Cir. 2014)**, but this quotation does not appear in *Apple, Inc.*  Lexos next cited *Liquid Dynamics*.  The quote is not in that case either, and, as described above, *Liquid Dynamics* holds contrary to Lexos's statement of law with respect to the relevance of an expert opinion based on an incorrect claim construction.[43]

7.    Lexos cited two Tenth Circuit decisions for the proposition that under that court's standards, "exclusion is a drastic remedy reserved for fundamentally unreliable expert analysis, not for technical deficiencies that can be addressed through cross-examination": ***Rodriguez-Felix*** and ***Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1088 (10th Cir. 2000)**.[44]  As stated above, *Rodriguez-Felix* addresses the reliability of expert testimony on eyewitness

---

[41] *Id.* at 1224 n.2.

[42] Doc. 194 at 8.

[43] *Liquid Dynamics*, 449 F.3d at 1224 n.2.

[44] Doc. 194 at 9.

credibility and excluded the expert's opinion in that case.[45]  And *Goebel* does not contain any language about exclusion being a drastic remedy; it reversed the district court's decision to *admit* an expert report because it had not made sufficient findings under *Daubert* to support admitting the expert testimony; it remanded for the district court to put more explicit findings on the record for review.[46]  Neither case discussed nor applied *Daubert* in the context of a "technical deficiency."

8.    Lexos explained the Federal Circuit's decision in ***Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1174–75 (Fed. Cir. 2008)** as follows:

> [T]he Federal Circuit considered the phrase "expandable to a diameter."  The Court held that this language did not limit the structure to only that diameter, but rather described a capability or result—not an exclusive state.  Likewise, "modify . . . to [an image] in the shape and appearance of [another image]" does not demand exclusive substitution.  Rather, it permits the modified cursor to include or incorporate the specific image's shape and appearance, while retaining or overlaying other visual features.[47]

These quotations do not appear in *Cordis*.  Almost as troubling, the patents that are discussed in *Cordis* do not appear to contain any of the language quoted above.

9.    Lexos included a citation to ***Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008)** with the following quotation in an explanatory parenthetical: "The use of 'comprising'. . . renders the claim open-ended—meaning that the claim does not exclude additional elements or steps."[48]  This quotation does not exist.

---

[45] 450 F.3d 1117, 1123–27 (10th Cir. 2006).

[46] *Goebel*, 215 F.3d at 1088–89.

[47] Doc. 194 at 12.

[48] *Id.*

10.    Lexos included a citation to ***AstraZeneca AB v. Mutual Pharm. Co.*, 384 F.3d 1333, 1339 (Fed. Cir. 2004)** with the following quotation in an explanatory parenthetical: "The open-ended term 'comprising' permits the inclusion of other steps or components."[49]  This quotation does not exist.

11.    Lexos purported to quote the earlier-cited ***Microsoft Corp***. case as follows: "[T]he question of whether the expert is credible or whether his theories are correct given the partial reliance on an incorrect claim construction is for the jury to decide after cross-examination."[50]  This quotation does not exist.

Part III.D.1 of the summary-judgment response repeats the incorrect quotations from *Cordis*,[51] *Baldwin Graphic Systems, Inc.*,[52] and *AstraZeneca AB*.[53]

## C.    Motion for Leave to Correct

In the reply to the response on the motion to exclude Dr. Russ, Overstock pointed out the citation errors in Lexos's opposition brief.[54]  Eight days later, Lexos filed a motion for leave to file a corrected response brief.[55]  Lexos stated that after reading Overstock's reply, it reviewed the opposition brief and "discovered that certain case citations and quotations could not be substantiated."[56]  The motion admitted that Mr. Seth used AI tools in drafting the opposition and that he did not verify the citations before filing.  In a footnote, the motion acknowledged that the

---

[49] *Id.*

[50] Doc. 194 at 13–14 (quoting *I4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011)).

[51] Doc. 193 at 33–34.

[52] *Id.* at 34.

[53] *Id.*

[54] Doc. 200 at 6 & n.1; Doc. 200-1.

[55] Doc. 207.

[56] *Id.* ¶ 3.

summary-judgment response also contains "two paragraphs with the same mistake which were carried over concerning the *Cordis*, *Baldwin*, and *AstraZeneca* cases" and requested that "the Court strike these citations."[57]

Mr. Seth submitted a declaration in conjunction with the reply in support of the motion for leave to correct.[58]  No other attorney for Lexos did so.  In that declaration, Mr. Seth acknowledged the errors in Docs. 193 and 194, admitted that they were derived from his research using generative AI that was not independently verified prior to submission, admitted that he "authored the majority of the document," and stated that he regrets the "oversight" and has put into place "stricter internal review procedures to ensure that all future filings are fully sourced, accurate, and independently verified."[59]  Mr. Seth indicated in this declaration that at the time of filing, he was struggling with multiple family health emergencies; his mother and aunt were both hospitalized and ultimately passed away in July and early August.  He indicated that "[t]hese overlapping personal situations weighed heavily on [his] time, attention and emotional state during the time of original filing,"[60] and although he acknowledged that this does not excuse his conduct, he claimed that it was unprecedented and that he did not intend to file the document without first verifying the citations.

The proposed corrected response brief would have: (1) deleted the nonexistent citations and quotations; (2) corrected the incorrect citations; (3) deleted the offending citations from the table of authorities; (4) added one new citation; and (5) added text to shore up Lexos's arguments.

---

[57] *Id.* at 3 n.1.

[58] Doc. 211-1.

[59] *Id.* ¶¶ 2, 3, 9.

[60] *Id.* ¶ 7.

Because there was nothing in the docket text that pointed this Court to an allegation of sanctionable conduct, it was not alerted to this issue until it reviewed the motion to correct in conjunction with the substantive motions several months later.  On December 15, 2025, upon review of the relevant filings, the Court denied Lexos's motion for leave to correct to the extent it sought to shore up its substantive research with new or corrected authority, or with new arguments.[61]  The Court found that the prejudice to Overstock cannot be overstated, that the errors have wasted judicial resources, and that the need to correct was well within the control of Plaintiff's counsel.  The Court acknowledged Mr. Seth's admission that he used generative AI without validation, and his remorse, but it determined that a "do-over" was not warranted.  Instead, the Court denied the motion to file the proposed corrected brief, struck Plaintiff's response brief filed as Doc. 194, and granted Plaintiff's motion to correct with a new filing that removed the fake and incorrect citations, quotations, and misstated authority from the document.  Lexos timely filed this corrected document on December 19, 2025.[62]

Also on December 15, the Court entered an Order to Show Cause to all counsel of record for Lexos.  The Court was not satisfied with Mr. Seth's declaration that was submitted along with the reply brief on the motion to correct, given that four other attorneys' names are listed on the signature blocks of the offending documents.  The Court directed each of the attorneys on the signature blocks of Docs. 193 and 194 to show cause in writing, under penalty of perjury, why they should not be sanctioned under Rule 11 and referred to the disciplinary panel of this Court and to disciplinary administrators in the jurisdictions where they are licensed for submitting briefs containing nonexistent or misrepresented authority.  The Court put counsel on notice that

---

[61] Doc. 214.

[62] Doc. 216.

failure to show cause may result in sanctions under Rule 11, including monetary sanctions, attorneys' fees, revocation of pro hac vice privileges, continuing legal education requirements, and reporting obligations in their other cases and to the judges whose decisions were misquoted, misrepresented, or made up.[63]  Counsel have now filed their declarations.  The following findings of each attorney's role are based on these declarations.

### D.    Lexos Attorneys' Roles in Submitting Docs. 193 and 194

#### 1.    Mr. Seth

Mr. Seth has practiced law for over thirty years.  He makes clear in his second declaration that he alone used generative AI to insert the problematic citations, quotations, and discussions of authority into the offending briefs.  After writing an initial draft of the *Daubert* response on June 28, 2025, Mr. Seth used ChatGPT "as a shortcut to find 10th [C]ircuit and Federal Circuit case law consistent with the facts of the case."[64]  That first search provided him with the quotations and citations for the mistakes in items 3–5 and 11 above.  He admits that he did not check these citations, quotations, or statements of authority for accuracy.  He then circulated the draft to the "litigation team."[65]

Mr. Seth then wrote a second draft that "substantially expanded the factual basis of our argument."[66]  Again, he queried ChatGPT to find additional case law.  Part of that query was: "[t]aking the role of a judge, write an order that denies the motion to strike with caselaw support for the proposition that where the expert report is criticized for inadvertently using an immaterial

---

[63] The Court recognizes that attorneys' fees are not an option for sanctions when it acts sua sponte, as it did here.  *See* Fed. R. Civ. P. 11(c)(5)(B).  Therefore, notwithstanding the language in its Order to Show Cause, the Court will not impose this sanction.

[64] Doc. 217-1 ¶ 7.a.

[65] *Id.*  Mr. Seth does not specify who the litigation team included.

[66] *Id.* ¶ 7.b.

incomplete claim construction, the remedy is not to strike the entire report/testimony of that expert."[67]  Mr. Seth believed this would give him the best chance of finding on-point case law. That query resulted in the mistakes in items 1, 2, 6, and 7 above.  Mr. Seth does not address the nonexistent quotations set forth in items 8–10 above.

At some point, Mr. Doell provided minor edits to Mr. Seth's draft, but these were exclusively to add exhibit numbers and make small typographical suggestions.  As the junior attorney working on this case, he was not instructed to make substantive revisions or second guess the senior co-counsel's work.  Mr. Doell made these minor edits and executed a declaration for the exhibits.[68]

Mr. Seth contends that "neither co-counsel nor Lexos were aware of" his use of generative AI, and that "Lexos was not billed for any of [his] time in the drafting of the brief (and the portion of Document 193) containing the erroneous citations or for any subsequent time in connection with their removal."[69]

Mr. Seth contends that his family's emergency medical situation led him to reach for ChatGPT to help draft the *Daubert* response and that this was the first and only time he used it. He claims to have been "untrained" on how to use it and a "novice."[70]  He insists that using ChatGPT is not his normal practice for research and that he made an isolated poor decision due to the strain of end-of-life caregiving for his mother and aunt.  Because his focus was elsewhere, he failed to "double-check for accuracy."[71]  He states that only now is he "fully aware of 'AI

---

[67] *Id.*

[68] *See* Doc. 194-1.

[69] Doc. 217-1 ¶ 6.

[70] *Id.* ¶ 8.

[71] *Id.* ¶ 10.

hallucinations' and take[s] full and sole responsibility for the resulting misinformation to the Court."[72]  At the same time, Mr. Seth states that he "inten[ded] at the time to check [the cites] prior to any filing with the Court, but [he] failed to do so either because [he] thought [he] had already done so, or just because of [his] scrambled state of mind."[73]

## 2.    Buether Joe and Counselors, LLC Attorneys

Mr. Joe is the lead attorney in this matter and the managing member of the Buether Joe law firm.  Mr. Joe played no role in drafting or compiling the defective citations in Docs. 193 and 194.  In fact, he attests that he never reviewed or looked at either document prior to filing.  The Buether Joe law firm has a policy of not allowing the use of AI platforms by members of the firm.  He provides no information about how this policy is enforced.

Mr. Kula is a senior counsel at the Buether firm.  He played no role in drafting or compiling the defective citations in Docs. 193 and 194.  He admits that he "never reviewed either document at issue prior to them being filed with the Court."[74]  Instead, Mr. Kula worked on responding to the other *Daubert* motion that sought to exclude Lexos's damages expert.  When Docs. 193 and 194 were filed, Mr. Kula was on a family vacation out of the country.  Mr. Kula understood that Mr. Doell was primarily responsible for drafting "limited sections" of the summary-judgment response, but that Mr. Seth had "overall responsibility to research, draft, review, finalize, and ensure the proper filing of both documents at issue."[75]

Mr. Doell is an associate attorney at the Buether Joe law firm.  As stated above, he primarily drafted several sections of the summary-judgment response, which did not include

---

[72] *Id.* ¶ 14.

[73] *Id.* ¶ 9.

[74] Doc. 217-4 ¶ 6.

[75] *Id.* ¶¶ 11, 12.

section III.D.1.  Mr. Doell attests that his portion of the brief did not utilize AI; he understood

and abided by his firm's policy prohibiting the use of AI platforms in writing, drafting, or

creating documents to be filed in court.  Despite reading over and editing Mr. Seth's work, he

was not aware, nor did he have reason to be aware, that Mr. Seth used AI in drafting the *Daubert*

response.  He makes clear that in his subordinate role as an associate attorney working with co-

counsel who has 30 years of patent law experience, he "did not provide, nor intended to provide,

nor was expected to provide a substantive review of the caselaw or arguments in Mr. Seth's draft

of Document 194."[76]

### 3.    Mr. Cooper

Mr. Cooper is local counsel.  In that capacity, he signed Docs. 193 and 194 and filed

them on behalf of Lexos.  Mr. Cooper is a partner at the Fisher Patterson law firm, and has

appeared in this Court many times over the last 25 years.  He was aware that this Court's local

rule requires that "[a]ll pleadings or other papers signed by an attorney admitted pro hac vice

must also be signed by a member of the bar of this court in good standing, who must participate

meaningfully in the preparation and trial of the case or proceedings to the extent the court

requires."[77]

As already stated, Mr. Cooper received Docs. 193 and 194 on the day that they were due.

In a past filing in this case, Mr. Cooper "noticed an incomplete citation in a draft before filing,"

which he corrected.[78]  On July 7, 2025, he read the documents provided to him by the Texas

attorneys, but because none of the citations or arguments looked suspicious to him, he did not

cite check them.  He had no knowledge that Mr. Seth used generative AI to compile his research,

---

[76] Doc. 217-3 ¶ 11.

[77] D. Kan. Rule 83.5.4(b).

[78] Doc. 217-2 ¶ 14.

or that he included defective citations and statements of authority in the briefs. He relied on Mr. Doell and Mr. Seth to include accurate and authentic legal authority in the documents. Mr. Cooper approved affixing his signature and then filed the offending documents in the Court's CM/ECF database.

Mr. Cooper apologizes to the Court and sets forth steps his firm has taken since the Court issued its Order to Show Cause to ensure that this grievous error does not occur again. Fisher Patterson has adopted a formal policy prohibiting the use of generative AI platforms without the consent of the client and the express permission of the supervising partner or attorney on the case. All documents produced using generative AI will be required to be independently verified by the author as being true and accurate. The firm is also developing a policy that will extend this policy to its attorneys' practice as local or co-counsel, requiring local counsel to independently cite-check and verify the accuracy of all citations.

## II.    Legal Standard

Under Rule 11(b):

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> . . . .
>
> (2)    the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law . . . .

As the Supreme Court has explained, "the central purpose of Rule 11 is to deter baseless filings in district court and thus, consistent with the Rules Enabling Act's grant of authority, streamline

the administration and procedure of the federal courts."[79]  The rule "imposes . . . an affirmative

duty to conduct a reasonable inquiry into the facts and the law before filing, and . . . the

applicable standard is one of reasonableness under the circumstances."[80]  "The award of Rule 11

sanctions involves two steps.  The district court first must find that a pleading violates Rule 11.

The second step is for the district court to impose an appropriate sanction."[81]

 Where, as here, the Court invokes Rule 11 on its own initiative, it must order "an

attorney, law firm, or party to show cause why conduct specifically described in the order has not

violated Rule 11(b)."[82]  The Court met this requirement when it issued its Order to Show Cause

on December 15, 2025, giving Lexos's counsel the opportunity to show cause in writing why

they should not be sanctioned for signing Docs. 193 and 194, which contain nonexistent citations

and quotations, and misstatements of legal authority, in contravention of Rule 11(b)(2).

## III. Violation: Rule 11(b)

 The Court now turns to the first step of the Rule 11 analysis: whether the Lexos attorneys

submitted a pleading that violates Rule 11(b).  In determining whether an attorney's conduct

violates Rule 11, the Court employs an "objective reasonableness" standard.[83]  The question is,

"whether a reasonable attorney admitted to practice before [this] court would file such a

document."[84]  The Advisory Committee's note to the 1993 Rule 11 Amendments explains that

the rule "require[s] litigants to 'stop-and-think' before initially making legal or factual

---

[79] *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990).

[80] *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991).

[81] *Collins v. Daniels*, 916 F.3d 1302, 1319 (10th Cir. 2019) (citation modified).

[82] Fed. R. Civ. P. 11(c)(3).

[83] *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1182 (10th Cir. 2015).

[84] *Id.* (quoting *Adamson v. Bowen*, 855 F.2d 668, 673 (10th Cir. 1988)).

contentions."[85]  And this duty is nondelegable.[86]  Thus, when an attorney signs a filing, that attorney pledges that he or she conducted a reasonable inquiry into the existing law stated therein.[87]  "[B]lind reliance on another attorney can be an improper delegation of this duty and a violation of Rule 11."[88]

There is no question that citing to a nonexistent case, attributing a nonexistent quotation to an existing case, and misstating the law violates Rule 11(b).[89]  Such reliance does not constitute "existing law" and certainly does not provide to the Court a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.  As the Tenth Circuit recently noted, "there is nothing inherently problematic with the use of GenAI in the practice of law."[90]  Instead, the violation here is due to the failure to verify that the cases generated by ChatGPT actually exist and confirm that they stand for the propositions for which they are cited.[91]  Because there is no dispute that all five Lexos attorneys signed both documents that included these errors, and they admit that not one of them verified that the case law in those

---

[85] Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.

[86] *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 126–27 (1989).

[87] *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 542 (1991) ("A signature certifies to the court that the signer has read the document, has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both, and is acting without any improper motive.").

[88] *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 495–96 (D. Wyo. 2025); *see also Dehghani v. Castro*, 782 F. Supp. 3d 1051, 1058 (D.N.M. 2025) (finding a Rule 11(b) violation where attorney "outsourced his duties to another attorney and failed to adequately review that attorney's work-product and ensure its accuracy before putting his own name on it and filing it with th[e] Court").

[89] *See, e.g.*, *Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024) ("At the very least, the duties imposed by Rule 11 require that attorneys read, and thereby confirm the existence and validity of, the legal authorities on which they rely."); *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 445, 461 (S.D.N.Y. 2023) ("A fake opinion is not 'existing law' and citation to a fake opinion does not provide a non-frivolous ground for extending, modifying, or reversing existing law, or for establishing new law."); *Coomer v. Lindell*, No. 22-CV-01129, 2025 WL 1865282, at *3 (D. Colo. July 7, 2025) ("Courts across the country—both within the United States Court of Appeals for the Tenth Circuit . . . and outside of it—recognize that Rule 11 applies to the use of artificial intelligence.").

[90] *Moore v. City of Del City*, No. 25-6002, 2025 WL 3471341, at *2 (10th Cir. Dec. 3, 2025).

[91] *See id.*

briefs actually exist and stand for the propositions for which they were cited, their conduct violates Rule 11(b)(2).

All of the attorneys focus their declarations on their lack of bad faith in signing these offending documents. But, as explained above, an attorney violates Rule 11 even when that attorney does not subjectively intend to deceive the court.[92] The standard is an objective one. And the Court cannot find that any of these attorneys met this objective standard here. It is undisputed that only Mr. Seth utilized ChatGPT and inserted the inaccurate legal authority from those queries into the documents, and that none of the other attorneys were aware that he did so. But all of the attorneys who signed the briefs had a nondelegable duty to conduct a reasonable inquiry into the legal authority relied on in the briefs before signing their names.[93] By signing their names to Docs. 193 and 194, they "certified that each filing had been reviewed and verified by human judgment," yet they were not.[94] As another district court in this circuit has noted under similar circumstances, "ignorance does not excuse [this attorney's] Rule 11(b) violations. It was [the attorney's] responsibility to ensure that the Brief, which he signed and filed, was accurate."[95]

---

[92] *See White v. Gen. Motors Corp.*, 908 F.2d 675, 680 (10th Cir. 1990) ("A good faith belief in the merit of an argument is not sufficient; the attorney's belief must also be in accord with what a reasonable, competent attorney would believe under the circumstances."); *In re Allen*, 248 F. App'x 874, 882 (10th Cir. 2007) (affirming district court's application of an objective Rule 11 standard when imposing sua sponte sanctions); *Omniq Corp. v. Redlpr, LLC*, No. 19-CV-437, 2025 WL 525044, at *9 (D. Utah Feb. 18, 2025) (rejecting argument that sua sponte sanctions must be decided under a subjective bad faith standard in the Tenth Circuit). *But see Kyros L. P.C. v. World Wrestling Ent., Inc.*, 78 F.4th 532, 543 (2d Cir. 2023) ("When a court initiates Rule 11 sanctions *sua sponte* and the opportunity to correct or withdraw the challenged submission is unavailable, the court must make a finding of bad faith on the part of the attorney before imposing the sanctions."); *United Nat. Ins. v. R&D Latex Corp.*, 242 F.3d 1102, 1115–16 (9th Cir. 2001) (explaining that sua sponte sanctions under Rule 11 should "ordinarily be imposed only in situations that are *akin to a contempt of court*").

[93] *Mattox v. Prod. Innovations Rsch., LLC*, No. 6:24-CV-235-JAR, 2025 WL 3012828, at *5 (E.D. Okla. Oct. 22, 2025) ("Responsibility under Rule 11 extends to all attorneys of record.").

[94] *Id.* at *4.

[95] *Dehghani v. Castro*, 782 F. Supp. 3d 1051, 1059 (D.N.M. 2025).

The Court finds that Mr. Doell was placed in an untenable position by his superiors.  He was directed to draft much of the summary-judgment response, not including the portion that came from Mr. Seth's faulty ChatGPT research.  There is no indication that his own work product utilized unverified research, and he attests under penalty of perjury that it did not.  He was also told to provide limited edits of Mr. Seth's work, but not to conduct a substantive review.  The Court is mindful that this created a difficult power differential—Mr. Doell is the associate attorney on this matter, and Mr. Seth was co-counsel bringing 30 years of experience and no prior ethical lapses or violations to the table.  Mr. Doell's superiors at the Buether Joe firm apparently had no role in reviewing these two documents or supervising his work.  One of them was out of the country on the date they were filed.  Nonetheless, Mr. Doell played a role in drafting and editing these documents, and under the objective standard that applies to Rule 11(b)(2), he did not make a reasonable inquiry into the law relied on by Mr. Seth before he signed them.  Had he done so, he would have discovered these many errors.

Mr. Joe and Mr. Kula did not even read the documents before they were filed.  They should have known that giving signature authority without review runs the risk of violating Rule 11.  As another district court in the Tenth Circuit has explained, "[w]hen an attorney gives another permission to sign on their behalf without reviewing the document, it is not only actionable under Rule 11 but also a possible violation of a state's ethical rule of competence."[96]  Indeed, "*no* inquiry cannot be deemed objectively reasonable even if the reliance is placed in an experienced attorney."[97]  There was a simple way for these attorneys to avoid the risk of a

---

[96] *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 496 (D. Wyo. 2025).

[97] *Id.*

violation: they did not have to sign the documents. By doing so, they placed their imprimatur on the filings and are therefore subject to the consequences of that decision.[98]

Mr. Cooper, as local counsel, read the documents, but he failed to cite-check them, despite having discovered a citation error in a previous brief submitted to him for filing in this case.[99] He admits relying on his co-counsel to properly cite the cases therein when he signed his name to the documents. But by blindly relying on his co-counsel, he delegated a nondelegable duty. Adherence to Rule 11 is particularly important in the context of local counsel. In this district, counsel admitted pro hac vice may not directly file documents in CM/ECF. They are required to use local counsel to do so. And local counsel gives those filings "a presumption of legitimacy."[100] This is why the Court's local rule requires pleadings prepared by pro hac vice attorneys be signed by local counsel who is in good standing and that local counsel meaningfully participate in the proceedings.[101] Mr. Cooper abdicated this responsibility by not confirming the accuracy of the authority in Docs. 193 and 194 before affixing his signature and filing them under his own name.

There was simply no oversight provided by the many seasoned attorneys of record for Lexos when responding to these motions, despite the fact that they each had a duty under Rule 11, not to mention the rules of professional responsibility, to ensure that the documents they

---

[98] *See Mattox*, 2025 WL 3012828, at *8 ("When a lawyer lends his signature, or his silence, to filings without inquiry, he converts inattention into representation and transforms friendship into liability.").

[99] *See* Doc. 217-2 ¶ 14 ("The process described in ¶ 13, *supra*, differs from the review and approval of at least one earlier filing where I had noticed an incomplete citation in a draft before filing. I found the original case and corrected the citation before filing the document.").

[100] *Mattox*, 2025 WL 3012828, at *8.

[101] *See* D. Kan. Rule 83.5.4; Doc. 51 (Mr. Cooper's signed pro hac vice application on behalf of Mr. Seth agreeing to "participate meaningfully in the preparation and trial of this case.").

signed were based on existing law.  As such, they all violated Rule 11 when they signed or allowed their names to be added to the signature blocks of Docs. 193 and 194.

## IV.     Sanctions: Rule 11(c)

While the Rule 11(b) violation in this case is crystal clear to the Court, the appropriate sanction for each attorney is more difficult.  The rule dictates that any sanction imposed "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."[102]  And the Court must consider the relative fault of each attorney in fashioning sanctions.[103]

This Court has already stricken Doc. 194 and granted leave to Lexos to file a corrected document that removes the offending citations.  As a practical matter, this removed all but three case citations that counsel previously submitted in support of the motion, and all of the substantively-specific authority Lexos previously used to persuade the Court not to grant the motion to strike.   Although the Court did not explicitly address the summary-judgment response in its order on the motion for leave to correct, at this time it also strikes the offending authority that was copied from the *Daubert* response into Part III.D of the summary-judgment response. Beyond this consequence of counsel's conduct, the Court discusses below the relative fault of each attorney and the sanctions, if any, it imposes.

In considering the range of sanctions available, the Court cannot ignore the context in which these violations occur.  The sheer amount of case law that has erupted over the last few years due to attorneys' reliance on unverified generative AI research, often generating

---

[102] Fed. R. Civ. P. 11(c)(4).

[103] *White v. Gen. Motors Corp.*, 908 F.2d 675, 685–86 (10th Cir. 1990).

hallucinated legal authority, is staggering.[104]  There are too many sanctions orders at this point

by other courts to cite them all,[105] and the problem has been reported in news sources.[106]  The

American Bar Association[107] and many state bar associations have issued guidance.[108]  Several

courts now either have notices, local rules, or standing orders that address the use of generative

AI by litigants.[109]

---

[104] *See* Anna Conley, *Understanding the Duty of Competence for Attorneys Using Generative AI*, 27 N.C. J. L. & Tech. 65, 75 & n.38 (2025) (stating that the author had located over 40 different cases involving attorneys citing generative AI with nonexistent cases and citing to high profile examples); *see also* Evan Gorelick, *Vigilante Lawyers Expose the Rising Tide of A.I. Slop in Court Filings*, N.Y. Times (Nov. 11, 2025), at B3 (referencing lawyer and researcher Damien Charlotin's attempt to create online databases tracking cases that deal with fabricated cases generated by A.I. and noting at that time that he had documented 509 such cases); *Tracking Federal Judge Orders on Artificial Intelligence*, Law360, https://www.law360.com/pulse/ai-tracker (last visited Jan. 27, 2026) (aggregating 59 cases).

[105] *See, e.g.*, *Johnson v. Dunn*, 892 F. Supp. 3d 1241, 1266 (N.D. Ala. 2025) (collecting cases); *Mattox v. Prod. Innovations Rsch., LLC*, No. 24-CV-235, 2025 WL 3012828, at *6–7 (E.D. Okla. Oct. 22, 2025) (same).

[106] *See, e.g.*, Benjamin Weiser, *So, Have You Heard the One About the Lawyer Using A.I.?*, N.Y. Times (May 29, 2023), at A1; Sarah Martinson, *Judges' AI Orders Keep Trickling in as Fake Citations Persist*, Law360 (July 21, 2025), https://www.law360.com/pulse/articles/2357542?; Daniel Wu, *Lawyers Using AI Keep Citing Fake Cases in Court. Judges Aren't Happy*, Washington Post (June 3, 2025), https://www.washingtonpost.com/nation/2025/06/03/attorneys-court-ai-hallucinations-judges/.

[107] A.B.A. Comm. on Ethics & Pro. Resp., Formal Op. 512 (2024).

[108] *See* A.B.A. Task Force on Law & A.I., Addressing the Legal Challenges of AI, Year 2 Report on the Impact of AI on the Practice of Law, at 47 (Dec. 2025) (compiling state bar ethics rules and guidance).   Mr. Seth is licensed in Texas and California.  Both state bars provide guidance on attorneys' use of AI.  State Bar of Cal. Standing Comm. on Pro. Resp. & Conduct, Practical Guidance for the Use of Generative Artificial Intelligence in the Practice of Law (2023) (providing guiding principles regarding how the rules of professional responsibility should be applied to lawyers' use of generative AI, including that under Rules 1.1 and 1.3, "AI-generated outputs can be used as a starting point but must be carefully scrutinized. They should be critically analyzed for accuracy and bias, supplemented, and improved, if necessary. . . .   A lawyer's professional judgment cannot be delegated to generative AI and remains the lawyer's responsibility at all times"); Tex. Comm. on Pro. Ethics, Op. 705 (Feb. 2025) ("While there may be many ways that generative AI can assist in the practice of law and benefit lawyers and clients alike, Texas lawyers must always be aware of the ethical issues that may arise in the use of generative AI. Among many other issues, lawyers should acquire basic technological competence before using any generative AI tool, should always ensure that the tool does not imperil confidential client information, should always verify the accuracy of any responses received from a generative AI tool, and should not charge clients for the time 'saved' by using a generative AI program.").

[109] *See, e.g.*, United States District Court for the District of Connecticut, Notice to Counsel and Litigants Regarding AI-Assisted Research, at https://www.ctd.uscourts.gov/; E.D. Tex. Admin. R. III(3)(m); *In re Use of Artificial Intelligence*, No. 3:24-mc-104, slip op. (W.D.N.C. June 18, 2024), at https://www.ncwd.uscourts.gov/sites/default/files/general-orders/AI%20Standing%20Order.pdf.  *See generally* RAILS, Analysis of AI Use in Courts, at https://rails.legal/resources/resource-ai-orders/ (providing table of court rules, local rules, and judicial guidelines governing the use of AI through May 2025).

A reasonably competent attorney filing documents in court should be aware of the pronounced, well-publicized risks of using unverified generative AI for legal research and the ethical obligations associated with signing a court filing without checking it for accuracy. Nonetheless, all of the attorneys here disclaim such knowledge.  Mr. Seth claims he was a novice and did not appreciate the risk of case hallucinations.  The Buether Joe attorneys suggest that because their firm had a strict prohibition on the use of AI, they had no further obligation to check their own work, and no reason to think that co-counsel, who was not covered by this internal policy, used AI.  Mr. Cooper relied on the Texas attorneys to cite check their work.  The Court finds that these attorneys' collective failure to devise a system of checking their filings for accuracy in the face of the well-publicized need to do so requires sanctions in order to deter repetition of this conduct by them and by other attorneys who are similarly situated.

The Court has considered the many other cases where judges have sanctioned attorneys for similar conduct.  In most of them, courts have imposed monetary penalties ranging from as high as $31,000,[110] to as low as $500.[111]  In addition to the admonishment contained in this Order, the Court imposes fines proportionate to the individual attorney's violation in this case, with the exception of Mr. Doell, as well as other targeted sanctions designed to ensure that these attorneys and others similarly situated do not commit similar infractions in the future.

---

[110] *Lacey v. State Farm Gen. Ins.*, No. CV 24-5205, 2025 WL 1363069, at *5 (C.D. Cal. May 5, 2025) (special master order sanctioning the plaintiff's law firms, including ordering them to pay compensation to the defense in the total amount of $31,000).

[111] *See, e.g.*, *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 495–96 (D. Wyo. 2025) ($3,000 fine for drafter; $1,000 for other attorneys who signed); *Cojom v. Roblen, LLC*, No. 23-CV-1669, 2025 WL 3205930, at *4 (D. Conn. Nov. 17, 2025) ($500 fine); *Coomer v. Lindell*, No. 22-1129, 2025 WL 1865282, at *8 (D. Colo. July 7, 2025) ($3,000 per attorney); *Mattox v. Prod. Innovations Rsch., LLC*, No. 6:24-CV-235-JAR, 2025 WL 3012828, at *8 (E.D. Okla. Oct. 22, 2025) ($3,000 fine for drafter, $2,000 for counsel of record who did not sign, and $1,000 for signer who did not review).

### A.    Mr. Seth

There is no doubt on this record that Mr. Seth carries the most relative fault.  He admits that he used ChatGPT without verifying its research results, he admits to not telling his co-counsel or the client that he did so, and he allowed his co-counsel to add their names to the documents despite this knowledge.  In fact, Mr. Seth asks the Court not to sanction any of the other attorneys for the violation and states that he is solely to blame.

In fashioning an appropriate sanction for Mr. Seth, the Court is mindful of the difficult family circumstances he was dealing with at the time of filing.  This situation was so serious that Mr. Seth states it had "a profound effect on [his] mental state at the time of this error that left [him] distraught and somewhat distracted."[112]  While the Court is sympathetic to Mr. Seth's family circumstances, it cannot ignore that there were obvious options open to him short of using a publicly-available generative AI search tool that he had never used before to research his brief without verifying the accuracy of that research.  The Court cannot understand why he did not share his situation, even generically, with one or more of his many co-counsel who could have helped him.  Mr. Kula handled the claim construction hearing and should have been in a position to assist him on this *Daubert* issue.  Another obvious option for Mr. Seth would have been to seek an extension of time to file his response brief.  Certainly caring for and attending to extremely sick or dying family members would have constituted good cause for an extension of time.[113]  Yet, he chose neither of these options.  Instead, Mr. Seth chose to use ChatGPT, not once but twice, and then failed to confirm that the very strong authority it generated was accurate.

---

[112] Doc. 217-1 ¶ 10.

[113] *See* Fed. R. Civ. P. 6(b)(1)(A).

Mr. Seth claims that this was the first and only time he used this tool that he admits he did not understand.  And despite using this tool for the first time while admittedly not understanding it, he claims that he intended to but did not check the accuracy of its output.  He blames this oversight on his emotional state at the time.  But the Court finds that, in addition to his failure to verify the accuracy of his research, Mr. Seth's admitted use of a generative AI tool without understanding it is an aggravating circumstance that it must consider when imposing a sanction.

The Court also takes into account Mr. Seth's remorse and the fact that he attempted to correct the defective pleading.  Mr. Seth apologizes to the Court, his co-counsel, and opposing counsel in his declarations, and assures the Court that he has learned his lesson.  While the Court is heartened by his remorse, several statements in Mr. Seth's declaration leave it convinced that further sanctions are necessary to deter future conduct both by Mr. Seth and by others similarly situated.

First, Mr. Seth overemphasizes the fact that he did not deliberately intend to deceive the Court.[114]  The Court recognizes that he did not set out to deliberately deceive the Court when he chose to use ChatGPT to generate case citations, quotations, and statements of the law that he then inserted into the briefs without checking them for accuracy.  But if Mr. Seth was not aware of the very real risk of case hallucinations resulting from unverified generative AI legal research, he should have been.  As referenced above, the number of cases, published and unpublished, that resulted in Rule 11 sanctions for this very conduct has ballooned in recent years.  And it has been highly publicized.  The states in which Mr. Seth is licensed have issued guidance.  A reasonable,

---

[114] Doc. 217-1 ¶¶ 12–14.

competent attorney in Mr. Seth's position should have been aware of the risks of using this research tool.

Second, the Court is troubled by Mr. Seth's assertion that he was merely seeking to corroborate "the approximately 95% of humanly generated brief and substantive arguments contained therein [that he] personally drafted based upon the facts in this case and not any AI output."[115]  This statement conveys that he does not appreciate the magnitude of his error.  A quick comparison of Mr. Seth's original and corrected draft belies his claim that the original brief was composed of 95% human-generated content.[116]  The correct brief is approximately two pages shorter than the faulty one.  The eleven misstatements of authority—all either nonexistent or incorrect—pervaded Doc. 194.

Moreover, the only human-generated content in the original brief is either generic, or made without citation to authority.  The false quotations, citations, and misrepresented authority were all highly specific to the issue raised in Overstock's motion.  And, as set forth in detail earlier in this opinion, these statements of authority were quite strong.  Mr. Seth did not merely query ChatGPT for a few citations to add after his own text.  He asked it to take on the role of judge and provide him with authority and language opposing the motion.  All citations in the brief, other than the generic references to the *Daubert* standard, were generated by his unverified use of ChatGPT.  All of them were problematic.  To deflect attention from this reckless conduct by focusing on the other language in the brief is inconsistent with the remorse that Mr. Seth expresses in other parts of his declaration.  The Court instead weighs heavily the severity of the

---

[115] *Id.* ¶ 14.

[116] *Compare* Doc. 194, *with* Doc. 216.

violation when fashioning Mr. Seth's sanction—the repeated instances of hallucinated case citations and quotations, and strong misstatements of authority.

In fashioning a sanction that focuses on deterrence, the Court is also mindful that Mr. Seth has and continues to represent Lexos and others in the field of patent law in courts around the country. Mr. Seth contends that much of his work is through contracts with co-counsel arrangements similar to the one in this case—where he completes work as co-counsel on briefs joined by other attorneys. Thus, his sanction must be designed to deter the violative conduct in this and other cases.

Mr. Seth indicates that it is his "practice going forward to never use AI to identify case law or quotes attributed to case law from AI," and that his employees and independent contractors will be advised the same.[117]  Respectfully, this is insufficient. As stated throughout this Order, the Rule 11(b) violation was not necessarily counsel's use of generative AI to conduct legal research. The violation was (1) failing to understand the technology so that he could use it in an informed way; and (2) failing to check the research it generated for accuracy.[118]  "As attorneys transition to the world of AI, the duty to check their sources and make a reasonable inquiry into existing law remains unchanged."[119]  Nothing about Mr. Seth's stated policy addresses the need for competence and verification. Thus, the Court directs Mr. Seth to implement a more robust policy designed to deter any future instance of submitting unverified authority in a filing. The Court will require him to submit to the Clerk for filing a certificate

---

[117] Doc. 217-1 ¶ 11.

[118] Whether Mr. Seth also violated the rules of professional responsibility is not before this Court. The Court will defer to Mr. Seth's state disciplinary authorities to make that determination.

[119] *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 493 (D. Wyo. 2025).

outlining specific internal procedures at his firm that he intends to impose that will ensure that the legal authority contained in the firm's work product is accurate.

With these considerations in mind, the Court imposes a monetary fine of $5,000 against Mr. Seth and revokes his pro hac vice admission to this Court, given that several other competent counsel appear in this matter on behalf of Lexos. The Court further directs Mr. Seth to self-report to the state disciplinary authorities where he is licensed by providing them with a copy of this Order, and to submit to the Clerk for filing by no later than February 28, 2026, a certificate outlining the specific internal procedures at his firm that will ensure that the legal authority contained in the firm's work product is accurate.

### B.    Mr. Kula

As already discussed, Mr. Kula did not generate the defective citations, nor did he contribute in any way to Docs. 193 and 194. Mr. Kula's violation was signing a filing despite failing to review it or otherwise ensuring that its contents were accurate. Mr. Kula instead assigned an associate, Mr. Doell, to work on the majority of the summary-judgment brief, and to assist Mr. Seth with both defective briefs. Mr. Kula left for a family vacation several days before these briefs were filed.

Because he had no knowledge that Mr. Seth used unverified generative AI to help draft Doc. 194, and inserted some of that defective authority into Doc. 193, and because he was only responsible for handling the response to a different *Daubert* motion, Mr. Kula asks that sanctions not be imposed. But as the Court has already explained, Mr. Kula's lack of knowledge that Mr. Seth used hallucinated authority in Doc. 194 does not absolve him of the Rule 11(b) violation. It is his failure to review these briefs at all, despite affixing his name to the documents, that

constitutes sanctionable conduct; he violated his duty to conduct a reasonable inquiry into the facts and the law before filing.

The Buether Joe attorneys appear to take the position in their declarations that because the firm had a flat prohibition on the use of "AI platforms by firm personnel or attorneys for writing, drafting, or creating documents to be filed with any court" and because they had no reason to believe Mr. Seth used generative AI to draft Doc. 194, they should not be sanctioned.[120]  Neither Mr. Kula nor Mr. Joe accept responsibility for signing the documents or failing to supervise their preparation.  Nor do they show any remorse for the fact that Docs. 193 and 194 were filed bearing their names with fabricated and misrepresented legal authority. Given Mr. Kula's abdication of his Rule 11 duties by affixing his name to documents that he failed to review, and his failure to acknowledge this breach, the Court finds a sanction is warranted.  In addition to the public admonishment in this Order, the Court imposes a fine of $3,000.

### C.    Mr. Joe

Like Mr. Kula, Mr. Joe states that he took no part in drafting or reviewing the defective filings in this case, despite allowing his name to be affixed to the documents and despite being the lead attorney in this matter.  And, like Mr. Kula, Mr. Joe fails to acknowledge that he breached a duty under Rule 11 by delegating his duty to conduct a reasonable inquiry into the facts and law in Docs. 193 and 194 before signing them.  For the same reasons the Court sanctions Mr. Kula, the Court finds that a sanction is warranted against Mr. Joe in the form of this public admonishment and a $3,000 fine.

---

[120] Doc. 217-4 ¶ 15; Doc. 217-5 ¶ 11.

In addition, given Mr. Joe's role as the managing member of his law firm, the Court imposes the additional sanction of ordering him to reconsider his firm's internal policies addressing the use of AI for generating filings in court.  As the Court explained in ordering the same for Mr. Seth, a mere prohibition on the use of AI platforms without any training, enforcement, or verification procedure does not ensure the Court that the Buether Joe firm will not be placed in a similar situation in the future, particularly if they submit briefs with co-counsel from outside the firm who would not be subject to its policy.  As the ABA's guidance provides:

> Model Rules 5.1 and 5.3 address the ethical duties of lawyers charged with managerial and supervisory responsibilities and set forth those lawyers' responsibilities with regard to the firm, subordinate lawyers, and nonlawyers.  Managerial lawyers must create effective measures to ensure that all lawyers in the firm conform to the rules of professional conduct, and supervisory lawyers must supervise subordinate lawyers and nonlawyer assistants to ensure that subordinate lawyers and nonlawyer assistants conform to the rules.  These responsibilities have implications for the use of [generative AI ("GAI")] tools by lawyers and nonlawyers.
>
> Managerial lawyers must establish clear policies regarding the law firm's permissible use of GAI, and supervisory lawyers must make reasonable efforts to ensure that the firm's lawyers and nonlawyers comply with their professional obligations when using GAI tools.  Supervisory obligations also include ensuring that subordinate lawyers and nonlawyers are trained, including in the ethical and practical use of the GAI tools relevant to their work as well as on risks associated with relevant GAI use.  Training could include the basics of GAI technology, the capabilities and limitations of the tools, ethical issues in use of GAI and best practices for secure data handling, privacy, and confidentiality.[121]

Thus, the Court directs Mr. Joe to cause the implementation of specific internal procedures at his firm that will ensure that the legal authority contained in the firm's future court filings are accurate.  The Court strongly encourages him to consider verification and training

---

[121] A.B.A. Comm. on Ethics & Pro. Resp., Formal Op. 512, at 10  (2024) (footnotes omitted).

requirements for all members of his firm.  He shall file by no later than February 28, 2026, a certificate outlining these procedures.

### D.    Mr. Doell

As the Court has already discussed, as the most junior attorney on this matter without supervisory authority, Mr. Doell was placed in a difficult position by his supervising attorneys. He was apparently neither expected nor instructed to substantively check Mr. Seth's work, despite being asked to execute a declaration in support of the exhibits attached to it, and despite being asked to conduct a technical edit.  One of his supervising attorneys at the firm was out of the country, and the other took no part in preparing, reviewing, or supervising the July 7, 2025 filings.  The Court finds that the public admonishment of this Order is sufficient to deter any similar future conduct by Mr. Doell and releases him from further sanctions.  The remedial sanctions that the Court imposes on Mr. Joe will apply to him as an associate at the firm and should prevent him from being placed in this situation again.

### E.    Mr. Cooper

As local counsel, Mr. Cooper signed the defective filings.  By doing so, he vouched for the Texas attorneys in this matter.  Although Mr. Cooper at least reviewed the filings before he submitted them to the Court, he did not cite-check them.  But the Court weighs heavily that, unlike Mr. Kula and Mr. Joe, Mr. Cooper acknowledges that he had a duty to check the filings for accuracy before signing and filing them under Rule 11 and that such duty was an objective one; he expresses remorse for failing to meet this duty, and he sets forth in detail his and his firm's efforts to ensure that a similar infraction does not occur again.

The Fisher Patterson firm has adopted a formal policy (1) prohibiting the use of generative AI platforms without the consent of the client and the express permission of the

responsible partner and, if different, the overseeing attorney, and (2) requiring that all documents produced using generative AI be independently verified by the author as being true and accurate. The firm is in the process of developing a policy that extends the formal AI policy to all instances where an attorney in the firm is local counsel and sponsors other attorneys as pro hac vice. In addition, Mr. Cooper has voluntarily sanctioned himself in the form of refraining from serving as sponsoring or local counsel for pro hac vice attorneys for a period of 12 months.

Thus, the Court finds that the admonishment in this Order, the policies adopted by Mr. Cooper's firm, and a $1,000 fine are sufficient to deter Mr. Cooper and any other local counsel who may be similarly situated from committing a similar infraction in the future.

**IT IS THEREFORE ORDERED BY THE COURT** that the following language is stricken in Lexos's response to Overstock's summary-judgment motion: Doc. 193 at 38 and 39, the entire paragraph under the heading "1. 'Modify . . . to' Does Not Imply Exclusivity" and the citations on page 39 to *Baldwin Graphic Systems, Inc.* and *AstraZeneca*.

**IT IS FURTHER ORDERED BY THE COURT** that all five Lexos attorneys are publicly admonished for violating Fed. R. Civ. P. 11(b) as set forth in this Order. The individual attorneys are further sanctioned under Rule 11 as follows:

- Mr. Seth is fined $5,000, the Court revokes his pro hac vice admission to this Court, he shall self-report to the state disciplinary authorities where he is licensed by providing them with a copy of this Order, and he shall submit to the Clerk for filing by no later than February 28, 2026, a certificate outlining specific internal procedures to be imposed at his firm that will ensure that the legal authority contained in the firm's future court filings are accurate.

- Mr. Kula is fined $3,000.

- Mr. Joe is fined $3,000 and shall file, by no later than February 28, 2026, a certificate outlining specific internal procedures to be imposed at the Buether Joe law firm that are designed to ensure that the legal authority contained in the firm's future court filings are accurate.

- Mr. Cooper is fined $1,000.

- Mr. Doell is released from any further sanctions.

The fines imposed by this Order shall be made payable to the Court's registry within 14 days of this Order.

**IT IS SO ORDERED.**

Dated: February 2, 2026

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE